IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA TOENNIES, | ) | CASE NO.  1:19-CV-02261-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |
| | ) | |

Plaintiff Pamela Toennies ("Plaintiff" or "Toennies") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In May 2018, Toennies filed an application for SSI, alleging a disability onset date of May 22, 2018 and claiming she was disabled due to post-traumatic stress disorder, anxiety, depression, sleep disorders, borderline personality, "schizoeffective," and swelling in her legs.  (Transcript ("Tr.") at 12, 50, 244.)  The application was denied initially and upon reconsideration, and Toennies requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 12.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

On May 29, 2019, an ALJ held a hearing, during which Toennies, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On July 8, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 12-24.)  The ALJ' s decision became final on August 15, 2019, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On September 28, 2019, Toennies filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.)  Toennies asserts the following assignments of error:

> (1)  Whether the ALJ erred in her assessment of the treating physician and nurse's opinions;
>
> (2)  Whether the ALJ erred in failing to account for Plaintiffs [sic] use of a walker;
>
> (3)  Whether the ALJ erred in relying on false and incomplete vocational testimony.

(Doc. No. 14 at 1.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Toennies was born in November 1968 and was 50 years-old at the time of her administrative hearing (Tr. 22), making her a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. § 416.963(d).  She has a limited education and is able to communicate in English.  (Tr. 22.)  She has past relevant work as a cashier checker.  (*Id.*)

### B. Relevant Medical Evidence[2]

On February 12, 2018, Toennies saw Dr. Yevgeniya Dvorkin-Wininger for complaints of neck and shoulder girdle pain.  (*Id.* at 656.)  Ms. Toennies also complained of having more numbness in her left hand and felt she was clumsier and "need[ed] to catch herself."  (*Id.* at 657.)  The numbness in her hand

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

occurred once a week, typically in the morning, and lasted a few minutes. (*Id.*) Toennies reported her left arm and shoulder pain was not as severe as before. (*Id.*) Toennies admitted she was not doing her HEP. (*Id.*)

Dr. Dvorkin-Wininger reviewed the results of Toennies's testing. (*Id.* at 657-58.) A November 2017 EMG of Toennies's cervical spine suggested a cervical radicular process, "although the precise levels involved could not be correlated with the limb muscle findings," and there was "no electrodiagnostic evidence of left median neuropathy." (*Id.* at 657.) A December 2017 brain MRI was normal. (*Id.*) A September 2017 MRI of Toennies's cervical spine showed mild degenerative changes of the cervical spine from C4-5 through C6-7, with no significant interval change from the prior study. (*Id.* at 658.) An August 2017 x-ray of Toennies's cervical spine showed mild to moderate degenerative changes from C4-C6 and slight retrolisthesis of C2 over C3 and C3 over C4 secondary to spondylosis, but there was no evidence of compression or malalignment. (*Id.*) A May 2017 x-ray of Toennies's left shoulder revealed rotator cuff tendinopathy. (*Id.*) An October 2015 MRI of Toennies's lumbar spine showed mild facet arthropathy at L4-5 and L5-S1, as well as minimal broad-based disc bulges at L3-L4 and L4-L5 which did not result in significant spinal canal or neural foramina narrowing. (*Id.*)

On examination, Dr. Dvorkin-Wininger found Toennies had 5/5 strength bilaterally in her upper extremities, with light touch intact bilaterally in the upper extremities with the exception of the left fifth digit. (*Id.* at 662.) Toennies's reflexes were hyperreflexic in the biceps, brd, triceps, and lower extremities symmetrically. (*Id.*) Dr. Dvorkin-Wininger found positive Hoffman's test bilaterally, but negative for clonus and Babinski's sign. (*Id.*) Toennies walked with a narrow-based gait and could not perform heel to toe walking. (*Id.*) Dr. Dvorkin-Wininger found tenderness to palpation of the right cervical paraspinal muscles, upper trapezius, and greater tuberosity. (*Id.*) Dr. Dvorkin-Wininger diagnosed Toennies with left neck and shoulder pain with cervical spondylosis, and potential radicular symptoms.

(*Id.*)  Dr. Dvorkin-Wininger told Toennies to continue HEP for her neck and shoulder stretches and ordered a brain MRI and testing for Vitamin B12 and D levels.  (*Id.*)  Dr. Dvorkin-Wininger prescribed 1000 mg of Tylenol a day as needed and continued gabapentin to 800 mg a day.  (*Id.*)

On February 27, 2018, Toennies saw Lindsey Kershaw, CNP, for evaluation and medication management.  (*Id.* at 2716.)  Toennies requested her Paxil dosage be decreased because it made her feel tired and unmotivated.  (*Id.* at 2717.)  Toennies also complained of muscle spasms in her leg and arm, as well as weight gain and lack of motivation.  (*Id.*)  Toennies reported her moods had "been pretty good," that her current mood was "okay," and that her medications helped her anxiety and enabled her to talk to people without getting irritated.  (*Id.*)  On examination, CNP Kershaw found Toennies exhibited a stable gait and well-groomed appearance.  (*Id.* at 2719.)  She was oriented times four and demonstrated normal language, attention/concentration, and associations.  (*Id.* at 2719-21.)  Toennies's fund of knowledge was appropriate for her age and education, she was alert and cooperative, her speech was fluent, and her short and long-term memory was intact.  (*Id.* at 2720.)  CNP Kershaw found Toennies's affect was constricted and appropriate to mood, and her mood euthymic.  (*Id.*)  Toennies showed fair insight and judgment, as well as a spontaneous, logical, and goal-directed thought process.  (*Id.* at 2720-21.)  CNP Kershaw found Toennies's comments contradictory at times.  (*Id.* at 2721.)  Toennies's diagnoses consisted of: major depressive disorder, recurrent, severe with psychosis; PTSD; severe alcohol use disorder in sustained remission; and mild cannabis use disorder, in sustained remission.  (*Id.* at 2722.)

On March 5, 2018, Toennies returned to Dr. Dvorkin-Wininger for "acute [follow-up] regarding left arm numbness that started about a month [ago]."  (*Id.* at 667-68.)  Toennies reported the numbness was constant and she could not use her left hand.  (*Id.* at 668.)  Toennies further reported while she did not have any pain in her arm, she felt her arm was weak.  (*Id.*)  Toennies also told Dr. Dvorkin-Wininger she continued to have memory problems; she was forgetful and felt it took a while for her to get her words

4

out.  (*Id.*)  Toennies denied any falls.  (*Id.*)  Dr. Dvorkin-Wininger reviewed Toennies's recent brain MRI, which was "negative for any acute abnormalities."  (*Id.* at 673.)  Dr. Dvorkin-Wininger referred Toennies to speech therapy for her cognitive impairment, told her to follow up with neurology, and instructed her to do home exercises for her neck/left arm complaints.  (*Id.*)

On April 2, 2018, Toennies saw Sasha Yurgionas, M.D., to re-establish care.  (*Id.* at 902.)  Toennies reported she had been sober from alcohol use for two years.  (*Id.*)  Dr. Yurgionas noted Toennies was positive for depression and nervousness/anxiety.  (*Id.*)  A physical examination revealed no edema but "faint comedones at bilateral temples."  (*Id.* at 903.)  Dr. Yurgionas noted Toennies was scheduled to see neurology and that she had "mild mental retardation."  (*Id.*)  Dr. Yurgionas "suspect[ed] pt is just now aware that she has difficulty with retaining info."  (*Id.*)  Dr. Yurgionas prescribed a multivitamin and Vitamin B complex for Toennies's poor memory, which was her primary encounter diagnosis.  (*Id.*)

On April 19, 2018, Toennies saw Nancy Carver, LISW-S, for a behavioral health assessment.  (*Id.* at 898.)  Toennies reported she had been getting along better with people for the last month, her appetite had been down but she had gained weight, and she had been having difficulty concentrating and focusing on her daily activities.  (*Id.*)  Toennies told Carver she would be talking to someone and "kinda like black out" and forget where she left off.  (*Id.*)  Toennies also reported short term memory loss that she believed was from her medication, not alcohol.  (*Id.*)  Toennies told Carver she was having auditory hallucinations consisting of hearing a door open when no one was there.  (*Id.* at 899.)  Carver noted anhedonia, sleep problems, hypersomnia, significant weight gain, intrusive memories, poor attention to detail, careless mistakes, poor attention to tasks, does not seem to listen, does not follow through on instructions, fails to finish tasks, easily sidetracked, reluctance to engage in tasks that require sustained mental effort, and

easily distracted. (*Id.*) Carver also noted Toennies was using a walker, but Toennies reported she "only use[s] it sparingly." (*Id.*)

On examination, Carver found Toennies healthy, alert, and in mild distress. (*Id.* at 900.) Carver determined Toennies's posture, behavior, mood, affect, orientation, judgment, insight, memory, attention, concentration, and thought content all within normal limits. (*Id.*) Toennies's facial expression was "sad/depressed," her speech "quiet and minimal," her mood "depressed" and "evasive." (*Id.*) While Toennies demonstrated blocking and tangential thoughts, her organization of thought was appropriate. (*Id.*) Her thought content was blaming and included ruminations and self-doubt. (*Id.*) However, Toennies demonstrated appropriate abstract reasoning and fair judgment and insight. (*Id.* at 901.) Carver diagnosed Toennies with: major depressive disorder, moderate, recurrent; borderline personality disorder; alcohol dependence in sustained remission; and PTSD. (*Id.*) Carver's assessment included the following statement: "While I agree that Pam has emotional and cognitive disabilities, I believe that Pam exaggerates her symptoms at times. I believe her psychotic symptoms are more related to BPD, than a thought disorder. Overall, her disabilities make it difficult for her to follow through with treatment recommendations. She needs a higher level of psychiatric care, than NFP can provide." (*Id.*)

On April 23, 2018, Toennies saw CNP Kershaw, complaining she had been "foggy." (*Id.* at 2724-25.) Toennies reported her sister had asked her not to cook any more after she put garlic bread in the oven for too long. (*Id.* at 2725.) Toennies described her moods as "pretty good actually" and that her anxiety had been "fine" with her medications. (*Id.*) Her energy levels were also "fine," although she said she could use more energy. (*Id.*) Toennies described a recent visit to the Soldier's Memorial downtown and reported she had been unable to stand in the long lines, that she "'needed her walker, and had a 'fear' of the stairs." (*Id.* at 2726.)

On examination, CNP Kershaw found Toennies had a stable gait, well-groomed appearance, good

6

eye contact, and appropriate hygiene and attire.  (*Id.* at 2727.)  Toennies was oriented times four, used normal language, exhibited normal attention and concentration, and demonstrated an appropriate fund of knowledge for her age and education.  (*Id.* at 2728.)  Toennies was alert, calm, and cooperative, and her speech was fluent.  (*Id.*)  CNP Kershaw found Toennies's short and long-term memory intact.  (*Id.* at 2728-29.)  While Toennies's affect was constricted, her mood was euthymic.  (*Id.* at 2729.)  CNP Kershaw found Tonennies showed fair insight and judgment and had a spontaneous and goal-directed thought process with appropriate thought content.  (*Id.*)  CNP Kershaw noted Toennies's comments were "contradictory at times."  (*Id.*)  CNP Kershaw also expressed "concern" for Toennies "reporting exaggerated symptoms."  (*Id.* at 2731.)

On April 30, 2018, Toennies returned to Dr. Yurgionas for medication refills and complaints of abnormal bowel function.  (*Id.* at 896.)  Toennies also requested repeat IQ testing now that she was sober.  (*Id.*)  Dr. Yurgionas's examination of Toennies revealed normal findings.  (*Id.* at 897.)

On May 22, 2008, Toennies saw CNP Kershaw and asked if she could take herself off her medications because she felt she was "doing well."  (*Id.* at 2733-34.)  Toennies reported she had been enjoying walking and looking out the window, and her moods and anxiety were "good."  (*Id.* at 2734.)  Toennies described her energy levels as "'not so much.'"  (*Id.*)  Toennies believed her medications were helping her.  (*Id.*)  CNP Kershaw noted Toennies complained of bilateral leg swelling.  (*Id.* at 2736.)

On examination, CNP Kershaw found Toennies had a stable gait, a well-groomed, well-nourished appearance, good hygiene, and good eye contact.  (*Id.*)  Toennies was oriented times four and exhibited normal language and attention/concentration.  (*Id.* at 2736-37.)  CNP Kershaw determined Toennies's fund of knowledge was appropriate for her age and education, she was alert, calm, and cooperative, her speech was fluent, and her short and long-term memory was intact.  (*Id.* at 2737.)  Toennies exhibited a constricted but stable affect and euthymic mood, fair judgment and insight, and a spontaneous thought

7

process.  (*Id.* at 2737-38.)  CNP Kershaw recommended Toennies continue her treatment at this time.  (*Id.* at 2739.)

On May 23, 2018, Toennies saw Dr. Yurgionas complaining of leg edema.  (*Id.* at 894.)  Toennies thought she was retaining water and was "[w]orried about risk of swelling in her lower legs."  (*Id.* at 895.)  Dr. Yurgionas noted Toennies had "many somatic concerns" that day.  (*Id.*)  Toennies also complained of back pain and fatigue, and she was using a rollator.  (*Id.*)  Dr. Yurgionas noted Toennies was nervous/anxious.  (*Id.* at 895.)  On examination, Dr. Yurgionas found no edema.  (*Id.*)  Dr. Yurgionas suspected "trace venous stasis edema" and prescribed compression stockings.  (*Id.*)

On June 11, 2018, Toennies returned to Dr. Dvorkin-Wininger with complaints of left arm numbness.  (*Id.* at 1343-44.)  While Toennies continued to have numbness, the gabapentin helped.  (*Id.* at 1346.)  Dr. Dvorkin-Wininger noted Toennies had not had a speech therapy appointment but had a pending neurology appointment regarding her memory problems.  (*Id.*)  Toennies reported "using a rollator on and off."  (*Id.*)  A physical examination revealed 5/5 muscle strength in the right arm, with "give way weakness throughout multiple myotomes" in the left arm.  (*Id.* at 1348.)  "All dermatomes" were numb to light touch in the left arm compared to the right.  (*Id.*)  Dr. Dvorkin-Wininger found Toennies was "hyperreflexic in the biceps, brd, triceps, [and] lower extremities symmetrically," a positive Hoffman's test bilaterally, negative Babinski's sign, and no clonus.  (*Id.*)  Toennies demonstrated a narrow-based gait, could not perform heel to toe walking, had +1 pitting edema in her left leg, and her left calf was 1.5 cm larger than her right.  (*Id.*)  Dr. Dvorkin-Wininger discussed the importance of leg elevation and ankle pump exercises and noted the compression stockings were pending.  (*Id.* at 1349.)  Dr. Dvorkin-Wininger also noted Toennies used a walker "as needed" for her unsteadiness.  (*Id.*)

On June 14, 2018, Toennies saw neurologist Michael Bahntge, M.D.  (*Id.* at 2657.)  Toennies complained of speech problems, in addition to memory problems and an inability to remember what she is

saying as she is talking.  (*Id.* at 2657-58.)  Toennies dated her memory problems to a month before her appointment.  (*Id.* at 2658.)  A physical examination revealed "widespread non-neurological weakness, including SCM's, characterized by various combinations of collapsing weakness, co-contraction of agonists and antagonists, and failure to posturally stabilize."  (*Id.*at 2659.)  While Toennies demonstrated 5/5 strength in her trapezius and shoulder and hip abductors when tested in tandem, there was local collapse when those same groups were tested one at a time.  (*Id.* at 2659-60.)  Dr. Bahntge found normal muscle tone and no involuntary movements.  (*Id.* at 2660.)  He noted Toennies used a "four wheeled walker with handbrakes" to keep herself from falling.  (*Id.*)  Toennies's responses to questions regarding orientation time were "nearly all near misses."  (*Id.*)  Toennies took "forever to register words for intermediate recall" and sat and stared "when pressed." (*Id.*)  Dr. Bahntge concluded: "She has non-neurologic weakness, and the character of her mental status exam suggests that it is cut of the same cloth. It is possible that the benztropine she is prescribed and the gabapentin adversely affect memory and alertness, but if so it is not evident to me from the character of her responses to mental status questions.  I have suggested she continue to follow up with her psychiatrist.  I have not scheduled a routine follow up visit for her at the current time." (*Id.*)

On July 5, 2018, Toennies saw Dr. Yurgionas for complaints of bilateral ankle swelling and pain in her wrists.  (*Id.* at 2914.)  Toennies reported she is "worried that she has a problem with her legs" and felt they were "very bloated" at the end of the day.  (*Id.*)  Toennies told Dr. Yurgionas she only had wrist pain when twisting the caps off water bottles; it was not present with other wrist movements, nor was it worse at night.  (*Id.*)  On examination, Dr. Yurgionas found no edema of the legs.  (*Id.* at 2915.)  Dr. Yurgionas diagnosed Toennies with tendonitis of the bilateral wrists and gave her wrist braces.  (*Id.* at 2916.)  Dr. Yurgionas provided "reassurance" regarding Toennies's legs.  (*Id.*)

On July 30, 2018, Dr. Yurgionas noted Toennies had requested a "Handicapped Placard" and

opined that for at least five years, Toennies is unable to walk 200 feet without stopping to rest and cannot walk without the use of or assistance of a brace, cane, crutch, another person, prosthetic device, wheelchair, or other assistive device.  (*Id.* at 2745.)  Dr. Yurgionas completed the same form on August 21, 2018, stating it was effective until August 21, 2023.  (*Id.* at 2746.)

On September 11, 2018, CNP Kershaw completed a Medical Source Statement regarding Toennies's mental capacity and opined Toennies had marked limitations in her ability to understand and learn terms, instructions, or procedures, as well as her ability to sequence multi-step activities.  (*Id.* at 2747-49.)  CNP Kershaw further opined Toennies had mild-to-moderate limitations in: interacting with others; concentration, persistence or pace; and adapting or managing oneself.  (*Id.*)  CNP Kershaw noted Toennies had a seventh-grade education and an undiagnosed learning disability.  (*Id.* at 2749.)

On September 13, 2018, Toennies returned to Dr. Dvorkin-Wininger for a functional capacity assessment.  (*Id.* at 2755-56.)  Toennies reported she had received her compression stockings and her leg swelling was better.  (*Id.* at 2756.)  Toennies told Dr. Dvorkin-Wininger she used a walker sometimes and had been having left groin pain after walking, as well as pain with walking.  (*Id.*)  Toennies did not have pain when walking short distances or sitting.  (*Id.*)  While Toennies reported continued left arm weakness, Dr. Dvorkin-Wininger noted there was no etiology for the numbness as all work ups had been negative. (*Id.*)  On examination, Toennies exhibited a narrow-based gait and could not perform heel-to-toe walking. (*Id.* at 2761.)

Dr. Dvorkin-Wininger opined Toennies had "mild to moderate functional limitations with regard to her musculoskeletal complaints."  (*Id.*)  Toennies could lift/carry up to 10-15 pounds at the waist level occasionally.  (*Id.*)  Toennies should avoid repetitive stooping or bending, as well as frequent lifting from the floor.  (*Id.*)  Toennies could sit for 30-minute intervals for 4-6 hours per day and stand for a maximum interval of 30 minutes for a total of 5-6 hours per day.  (*Id.*)  Dr. Dvorkin-Wininger further opined Toennies

10

could work at a sedentary level and that her psychiatric disorder was "likely the biggest contribute[r]" regarding her ability to work.  (*Id.*)

On September 17, 2018, Dr. Dvorkin-Wininger completed a Medical Source Statement regarding Toennies's physical capacity.  (*Id.* at 2767-68.)  Dr. Dvorkin-Wininger opined Toennies could lift and/or carry 5-10 pounds frequently and 15 pounds occasionally.  (*Id.* at 2767.)  Her ability to sit, stand, and walk was not affected by her impairments.  (*Id.*)  Toennies could rarely crawl, but she could frequently climb, balance, stoop, crouch, and kneel.  (*Id.*)  Toennies could occasionally reach, push, pull, and perform fine and gross manipulation.  (*Id.* at 2768.)  Dr. Dr. Dvorkin-Wininger stated a walker had been prescribed.  (*Id.*)  Dr. Dr. Dvorkin-Wininger opined Toennies had no environmental restrictions, nor did she need to alternate between positions at will.  (*Id.*)  Dr. Dvorkin-Wininger found Toennies had moderate pain that would interfere with her concentration, cause her to be off task, and cause absenteeism.  (*Id.*)  Additionally, Dr. Dvorkin-Wininger found Toennies would require two extra breaks per day.  (*Id.*)

On November 6, 2018, Toennies saw CNP Kershaw.  (*Id.* at 2859-60.)  Toennies reported taking herself off her medications for a week in October because she felt like she was doing better.  (*Id.* at 2860.)  She became irritable and started snapping at people, so she resumed taking her medications and was no longer irritable and snapping at others.  (*Id.*)  Toennies reported her moods had been "good" and her anxiety "mostly manageable," although she was getting panic attacks about once a month.  (*Id.*)  Her most recent panic attack was in October and only lasted for one minute.  (*Id.*)  Overall, Toennies felt like she was "doing 'actually good.'"  (*Id.*)

On examination, CNP Kershaw found Toennies had a stable gait, well-groomed, well-nourished appearance, and good eye contact.  (*Id.* at 2862.)  Toennies was oriented times four, had normal language, attention, and concentration, and had an appropriate fund of knowledge for her age and education.  (*Id.*)  CNP Kershaw found Toennies was alert, calm, and cooperative, and her short and long-term memory was

11

intact.  (*Id.*)  While her affect was constricted, her mood was euthymic and her judgment and insight fair. (*Id.* at 2863.)  Toennies demonstrated a spontaneous thought process with thought content that was appropriate to the circumstances.  (*Id.*)

On January 6, 2019, Toennies returned to CNP Kershaw and asked to be connected with a therapist. (*Id.* at 2866-67.)  Toennies reported she had been off her medications for a week because of a scheduled colonoscopy, but then had an increase in irritability, so she resumed her medications and canceled her colonoscopy.  (*Id.*)  Toennies told CNP Kershaw her energy levels were low and she had poor motivation, but overall she was doing well as long as she stayed on her medications.  (*Id.*)  Toennies reported her moods are good with her medication and her anxiety "fluctuate[d] due to situation stressors."  (*Id.*)

On examination, CNP Kershaw found Toennies had a stable gait, well-groomed, well-nourished appearance, and good eye contact.  (*Id.* at 2869.)  Toennies was oriented times four, had normal language, attention, and concentration, and had an appropriate fund of knowledge for her age and education.  (*Id.*) CNP Kershaw found Toennies alert, calm, and cooperative, and her short and long-term memory was intact.  (*Id.*)  While her affect was constricted, her mood was euthymic and her judgment and insight fair. (*Id.* at 2869-70.)  Toennies demonstrated a spontaneous thought process with thought content that was appropriate to the circumstances.  (*Id.* at 2870.)

On January 15, 2019, Toennies underwent a mental health diagnostic assessment at Recovery Resources.  (*Id.* at 2812.)  Toennies endorsed symptoms of depressed mood, insomnia or hypersomnia, decreased energy, delusions, increased arousal and intrusive thoughts.  (*Id.* at 2814-15.)  Toennies also reported having "an imaginary friend whom she sees periodically."  (*Id.* at 2816.) On examination, Miranda Villard, LPC, found Toennies was well-groomed and cooperative, with average eye contact, calm motor activity, and clear speech.  (*Id.* at 2822.)  Toennies exhibited a blocked thought process and flat, constricted affect.  (*Id.* at 2823.)  LPC Villard found impairment of Toennies's ability to abstract, her

intelligence borderline, and her insight/judgment fair.  (*Id.*)  LPC Villard noted Toennies's "report of positive mood was contradictory throughout session duration" and her "perception of reality appeared to shift throughout the session duration."  (*Id.*)  Villard diagnosed Toennies with PTSD, major depressive disorder, recurrent episode, severe with psychosis, and alcohol use disorder, severe, in sustained remission.  (*Id.* at 2826.)

On January 23, 2019, Toennies saw Dr. Yurgionas for follow up.  (*Id.* at 2906.)  Toennies reported she had seen her primary care physician at Metro Health for her confusion but wanted Dr. Yurgionas to check her a1c levels as well as her urine.  (*Id.*)  Toennies reported pain in her wrists bilaterally with twisting caps off water bottles, but not with any other movement, and wore wrist splints/braces.  (*Id.* at 2907.)  Dr. Yurgionas's physical examination revealed normal findings.  (*Id.* at 2908.)

On January 31, 2019, Toennies returned to Dr. Dvorkin-Wininger for follow up with complaints of left arm pain.  (*Id.* at 2785.)  Toennies described the pain as "persistent" and "throbbing" and was located mainly in her forearm.  (*Id.* at 2786.)  The pain started in her elbow, went down to her wrist, and radiated to her fingers.  (*Id.*)  Dr. Dvorkin-Wininger noted Toennies's leg swelling had been resolved and that she used a walker "as needed."  (*Id.* at 2785.)  However, Dr. Dvorkin-Wininger found Toennies was "able to ambulate without devices and perform activities of daily living at a [sic] independent level."  (*Id.* at 2786.)  Dr. Dvorkin-Wininger found the same physical examination findings, with the addition of tenderness to palpation of the left elbow but full range of motion, negative Tinel's sign, and no redness or swelling.  (*Id.* at 2791-92.)  Dr. Dvorkin-Wininger diagnosed Toennies with left forearm pain possibly related to a conversion disorder, ordered an x-ray, and prescribed voltaren gel.  (*Id.* at 2793).  Toennies told Dr. Dvorkin-Wininger she was not interested in physical therapy.  (*Id.*)  The x-ray of Toennies's elbow was normal.  (*Id.* at 2807).

On February 11, 2019, Toennies returned to CNP Kershaw for follow up and reported she was

"doing good." (*Id.* at 2884-85.)  Toennies was trying to find independent housing through CMHA.  (*Id.* at 2885.)  Toennies had seen her pain management doctor for left elbow pain, and her doctor prescribed a topical cream that helped with the pain.  (*Id.*)  Toennies reported her moods had been good when she kept to herself, but she was irritable and anxious when around her ex-husband and son.  (*Id.*)  Her energy levels and motivation were low, but she saw her sister one to two times a month and enjoyed playing games on her phone/iPad.  (*Id.*)  CNP Kershaw found Toennies was well-groomed and well-nourished, and she had good eye contact.  (*Id.* at 2889.)  Toennies was calm, cooperative, and in no acute distress.  (*Id.*)  While her affect was constricted, her mood was euthymic and her judgment and insight fair.  (*Id.*)  Toennies demonstrated spontaneous speech, with normal rate and flow, as well as a logical, organized, and concrete thought process.  (*Id.*)  CNP Kershaw found Toennies had sustained attention/concentration and her recent and remote memory were within normal limits.  (*Id.*)  CNP Kernshaw noted: "Client reports fluctuating anxiety symptoms due to interpersonal relationship issues with her son/ex and is trying to seek independent living, otherwise she feels symptoms of mood/anxiety have been relatively stable."  (*Id.*)

On February 13, 2019, Toennies saw Dr. Yurgionas for complaints of nausea and feeling hot.  (*Id.* at 2903-04.)  Dr. Yurgionas diagnosed Toennies with hot flashes.  (*Id.* at 2905.)

On March 14, 2019, Toennies saw Christine Williams, CNP, for medication management and follow up regarding hypothyroidism and menopausal symptoms.  (*Id.* at 2900.)  Toennies reported she had been compliant in taking her Synthroid but she had dizziness "all the time" since starting it and clonidine a month ago.  (*Id.*)  While Toennies had no syncope, she felt at risk for syncope.  (*Id.*)  Toennies told CNP Williams the dizziness happened only in the shower, and she had been taking baths without any further problems.  (*Id.*)  A physical examination revealed normal range of motion, normal behavior, judgment, and thought content, flat affect, and good eye contact.  (*Id.* at 2902.)  CNP Williams reduced Toennies's clonidine dosage to once per day to address her dizziness.  (*Id.*)

14

On March 18, 2019, Toennies saw CNP Kershaw for medication management.  (*Id.* at 2926-27.) Toennies reported that "everything is working out good." (*Id.* at 2927.)  She had recently been diagnosed with hypothyroidism and was feeling good now that she was taking medication for it.  (*Id.*)  Toennies told CNP Kershaw her moods were good, and her energy levels were fair.  (*Id.*)  Toennies requested her gabapentin be increased so she could have an "as needed" dose when her anxiety fluctuated throughout the day.  (*Id.*) Otherwise, Toennies felt her medication was "'perfect.'" (*Id.*)

On examination, CNP Kershaw found Toennies was well-groomed and well-nourished, and she had a normal gait and good eye contact.  (*Id.* at 2930.)  Toennies was calm, cooperative, and in no acute distress.  (*Id.*)  While her affect was constricted, her mood was euthymic and her judgment and insight good.  (*Id.*)  Toennies demonstrated spontaneous speech, with normal rate and flow, as well as a logical and organized thought process.  (*Id.*)  CNP Kershaw found Toennies had sustained attention/concentration and her recent and remote memory were within normal limits.  (*Id.*)  CNP Kershaw noted Toennies was "relatively stable." (*Id.*)

On March 28, 2019, Toennies returned to Dr. Dvorkin-Wininger for follow up.  (*Id.* at 2936-37.) Toennies reported her left arm pain had "mildly improved" since her last visit.  (*Id.* at 2937.)  Toennies described her pain as achy/throbbing in nature and located in her left forearm but extended down through her wrist and into her fifth digit.  (*Id.*)  Toennies rated her pain at a 3/10 but it could be a 7/10 at its worst. (*Id.*)  Rest improved the pain, while activity worsened it.  (*Id.*)  Toennies denied any numbness, tingling, and motor weakness.  (*Id.*)  A physical examination revealed 5/5 muscle strength in the right arm, with "give way weakness throughout multiple myotomes" in the left arm.  (*Id.* at 2943.)  All dermatomes were intact to pin prick in the arms bilaerally.  (*Id.*)  Dr. Dvorkin-Wininger found Toennies was "hyperreflexic in the biceps, brd, triceps, [and] lower extremities symmetrically." (*Id.*)  Toennies demonstrated a narrow-based gait and could not perform heel to toe walking.  (*Id.*)  Dr. Dvorkin-Wininger found that while

Toennies had tenderness to palpation of the left elbow and Cozen's test was positive, she had full range of motion and no redness or swelling.  (*Id.*)  Tinel's sign was negative.  (*Id.*)  Dr. Dvorkin-Wininger diagnosed Toennies with left lateral epicondylitis and prescribed a left forearm counter-force band.  (*Id.* at 2944.)

On April 9, 2019, Toennies attended an occupational therapy appointment for her left elbow pain. (*Id.* at 2960).  Toennies described her pain as "burning" but "bearable."  (*Id.* at 2961.)  Voltaren gel improved the pain, and Toennies usually applied it before going to bed.  (*Id.*)  Toennies rated her pain as a 2/10.  (*Id.*)  Toennies reported difficulty in lifting a gallon of milk and had to use her right hand to vacuum and load dirty clothes into the washing machine.  (*Id.*)  Toennies stated it took her longer to get dressed and she had been wearing a sports bra because it was easier than reaching behind her back to fasten the clasp on a typical bra.  (*Id.*)  Toennies also reported family members had to help her with chores, emptying a pot of spaghetti into a strainer, and carrying laundry baskets.  (*Id.*)  While Toennies's elbow pain had been less severe lately, it was limiting the functional use of her arm.  (*Id.* at 2963.)  Kelly Cornachione, OT, recommended continued OT services to maximize Toennies's functional outcomes.  (*Id.*)

C.     **State Agency Reports**

1.     **Mental Impairments**

On July 13, 2018, Sandra Banks, Ph.D., found Toennies had moderate limitations in each area of the paragraph "B" criteria: understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself.  (*Id.* at 118-19.)  Dr. Banks stated the Psychiatric Review Technique Findings were "an adoption of the PRTF findings from the ALJ decision dated 09/25/2017 based on AR-98-4."  (*Id.*at 119.)  Those findings included the ability "to perform simple, routine tasks (unskilled work) with infrequent changes and with no fast pace or high production quotas."  (*Id.* at 122.)  Toennies could "engage in superficial interaction with others (meaning

of a short duration and for a specific purpose) and can perform low-stress work, meaning no arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility."  (*Id.*)

On October 17, 2018, Cynthia Waggoner, Psy.D., affirmed the findings of Dr. Banks.  (*Id.* at 136-37, 141-42).

### 2.      Physical Impairments

On July 13, 2018, Anton Freihofner, M.D., found Toennies capable of light work with additional limitations.  (*Id.* at 120-22.)  Dr. Freihofner stated the RFC was "an adoption of the RFC findings from the ALJ decision dated 09/25/2017 based on AR-98-4."  (*Id.* at 122.)  Those findings included the ability to "lift and carry 20 pounds occasionally and 10 pounds frequently," stand, walk, and sit for six hours of an eight-hour workday, and "unlimited pushing and pulling, other than as shown for lifting and carrying." (*Id.*)  Toennies could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds.  (*Id.*)  She could occasionally stoop, kneel, crouch, and crawl.  (*Id.*)  She could occasionally reach and frequently handle and finger with her left upper extremity.  (*Id.*)

On October 18, 2018, Gary Hinzman, M.D., affirmed the findings of Dr. Freihofner.  (*Id.* at 139-41.)

### D.      Hearing Testimony

During the May 29, 2019 hearing, Toennies testified to the following:

- She stays "here and there," between friends and family.  (*Id.* at 51.)  Twice a month, she stays with her son and his father.  (*Id.*)  She mostly stays at her sister's house. (*Id.* at 52.)  When she stays with her sister or her son and his father, she does not help with any chores around the house.  (*Id.*)  When she stays with other friends and family, she "may try to do the dishes for as long as [she] can stand."  (*Id.*)

- She is unable to bathe and dress herself.  (*Id.*)  When she stays with a girlfriend, her girlfriend helps her by fastening her bra in the back.  (*Id.*)  She can put on her pants and shirt by herself.  (*Id.*)  She is unable to bathe herself.  (*Id.* at 53.)  Her girlfriend helps her by giving her a sponge bath.  (*Id.*)  When she stays with her sister, she does not bathe.  (*Id.*)  When she stays with her son and his father, his father will help her by giving her a sponge bath and helping her in and out of the shower.  (*Id.*)

17

- She can get herself a bowl of cereal or make herself a sandwich if she is hungry. (*Id.*) She can also use the microwave if she needs it. (*Id.* at 53-54.)

- She does not do her own laundry. (*Id.* at 54.) Depending on where she stays, her son or her sister does it for her. (*Id.*) She tries to fold the laundry when it is dry. (*Id.*)

- She does not drive and has never driven. (*Id.*) She uses a handicap placard for whoever's car she rides in to get places. (*Id.*) She does use public transportation. (*Id.*) She came to the hearing by herself. (*Id.*)

- She enjoys going on Facebook and plays games on her phone. (*Id.* at 54-55.) She does not read books, magazines, or anything on the internet. (*Id.* at 55.) She does not watch television or listen to music. (*Id.*) She does not get any kind of regular exercise. (*Id.*)

- She underwent physical therapy for her left arm. (*Id.*)

- She brought a walker with wheels and a seat to the hearing. (*Id.* at 59.) She could not remember which doctor prescribed the walker, but it was first ordered by Metro Health. (*Id.* at 59-60.) She continues to use the walker on and off. (*Id.*) She does not use the walker inside but uses it when she goes out. (*Id.*) She holds onto the walls inside. (*Id.*)

- She had been approved for CMHA housing, but it was too far for her since she does not drive. (*Id.*) It was too far for her to get to her doctor's appointments. (*Id.*)

- Her physical condition has not changed since September 2017. (*Id.* at 61.) The walker was not new since 2017. (*Id.*) She has had the walker for five years. (*Id.* at 61-62.) Her mental health has gotten worse since 2017. (*Id.* at 62.) She has more problems than she used to, and she used to remember more things. (*Id.*) When speaking to people she stops and does not remember what she was saying. (*Id.*) She remembers things that happened long ago, but not recent things. (*Id.*)

- She developed tennis elbow since 2017. (*Id.* at 63.) Her doctors had her undergo physical therapy and do arm exercises. (*Id.*) Her use of the walker has remained the same since 2017. (*Id.* at 64.) She is still undergoing mental health treatment. (*Id.* at 65.) Even sober, she is still having mental health symptoms. (*Id.* at 66.)

- She can stand at the sink for ten minutes before her lower back and legs start to hurt. (*Id.*) She can walk for fifteen minutes with her walker before needing to stop and rest. (*Id.*) She can button things, but it hurts her hands to cut up food. (*Id.* at 67.) She does not have problems writing. (*Id.* at 68.) She can pick up a coin off the table and turn a doorknob, but it hurts to open a heavy door. (*Id.* at 68.) She has difficulty reaching behind her back to fasten her bra. (*Id.*)

The VE testified Toennies had past work as a cashier checker. (*Id.* at 70.) The ALJ then posed the following hypothetical question:

> First off, I would like you to consider a person with the same age, education and past work as the claimant who is able to occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds.
>
> This individual can stand and walk six hours of an eight hour workday. And can sit for six hours of an eight hour workday. The individual can perform occasional pushing and pulling with the left upper extremity.
>
> The individual can occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. They can occasionally stoop, kneel, crouch and crawl. Can perform occasional reaching with the left upper extremity, and frequent handling and fingering with the left upper extremity.
>
> This individual can perform simple, routine tasks consistent with unskilled work, with infrequent change and with no fast pace or high production quotas. This individual can engage in superficial interaction with others.
>
> And by superficial, I mean of a short duration for a specific purpose. And finally can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others and or supervisory responsibility.
>
> First off, given such a hypothetical individual, would this hypothetical individual be able to perform the claimant's past work as those occupations are either generally and or actually performed?

(*Id.* at 70-71.)

The VE testified the hypothetical individual would not be able to perform Toennies's past work as a cashier checker.  (*Id.* at 71.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as tanning salon attendant and parking lot attendant.  (*Id.* at 72.)

The ALJ modified the hypothetical by adding the hypothetical individual would require two extra 15-minute breaks per day.  (*Id.* at 73.)  The VE testified there would be no jobs.  (*Id.*)  The ALJ removed that limitation and replaced it with the limitation that the hypothetical individual would be absent from work two or more times per month.  (*Id.*)  The VE again testified there would be no jobs.  (*Id.*)

The ALJ modified the original hypothetical as follows: "I'm going to change lifting and carrying to occasionally lift and carry 15 pounds, and frequently lift and carry five to 10 pounds. Given that change

would that hypothetical individual be able to do the claimant's past work as those occupations are either generally and or actually performed?" (*Id.* at 74.) The VE testified past work had already been ruled out. (*Id.*) The ALJ asked if the two representative jobs the VE identified would still be available. (*Id.*) The VE testified, "At least when I looked at them, they've not exceeded -- . . . – a 15 pounds reach, or lift. I'm sorry." (*Id.*)

The ALJ modified the hypothetical again to limit the hypothetical individual to occasional handling and fingering with the left upper extremity. (*Id.*) The VE testified the hypothetical individual could not perform the two representative jobs identified, and also there would be no jobs for that hypothetical individual. (*Id.*)

### III.     STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is

presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since May 22, 2018, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: osteoarthritis (OA) of the cervical spine, lumbar facet arthropathy, right knee patella tendonitis, left rotator cuff arthropathy, left elbow lateral epicondylitis, left small finger tendon repair, major depressive disorder (MDD), posttraumatic stress disorder (PTSD), dependent personality disorder, borderline intellectual functioning (BIF) (20 CFR 416.920(c)).

3. The claimant does not have an impairment of combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with the following limitations: she is able to occasionally lift and carry 15 pounds and frequently lift and carry 5 to 10 pounds.  She is able to stand and walk 6 hours of an eight-hour workday.  She is able to sit for 6 hours of an 8-hour workday. She can occasionally push and pull with the left upper extremity.  She can occasionally climb ramps and stairs.  She can never climb ladders, ropes, and scaffolds.  She can occasionally balance, stoop, kneel, crouch, and crawl.  She can occasionally reach with the left upper extremity.  She can frequently handle and finger with the left upper extremity.  She can perform simple routine tasks (unskilled work) with infrequent changes and with no fast pace or high production quotas.  She can engage in superficial interactions with others (meaning of a short duration for a specific purpose) and can perform low-stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on November **, 1968 and was 49 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since May 22, 2018, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-23.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio

23

Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Treatment of Treating Physician and Nurse's Opinions

Toennies argues the ALJ erred in "only partially adopting" the September 13, 2018 and September 17, 2018 opinions of Dr. Dvorkin-Wininger, as well as rejecting CNP Kershaw's September 13, 2018 opinion. (Doc. No. 14 at 12, 16.) With respect to Dr. Dvorkin-Wininger's opinions, Toennies asserts the ALJ "erroneously failed to consider in depth the factors set forth in 20 CFR 404.1520©), [sic], or to set forth good reasons for his selective parsing of the treating psychiatrist's opinion." (*Id.* at 13.) With respect to CNP Kershaw's opinion, Toennies asserts "the ALJ's factually incorrect and perfunctory assessment of CNP Kershaw's opinions" require reversal or remand. (*Id.* at 17.)

The Commissioner responds the ALJ reasonably evaluated all medical opinions and properly weighed the evidence. (Doc. No 16 at 7, 9.) As a result, substantial evidence supports the ALJ's decision. (*Id.* at 9.)

As Toennies applied for SSI in May 2018, the new regulations governing the consideration and articulation of medical opinions and prior administrative medical findings (20 C.F.R. § 416.920c) apply. Under the new regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors,

24

including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

The new regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

25

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

### 1.        Dr. Dvorkin-Wininger's Opinions

Toennies argues the ALJ erred in finding Dr. Dvorkin-Wininger's September 2018 opinions only "somewhat persuasive" because "the ALJ bases her opinion on the perfunctory statement that 'the physical examinations, diagnostic tests, and treatment history do not support more physical limitations than those provided in the RFC' – without citing to any specific evidence to discredit Dr. Dvorkin-Winingers [sic] opinion."  (Doc. No. 14 at 14-15) (citation omitted).  Toennies further argues the ALJ misstated the evidence when she found "'the claimant herself testified that her physical conditions remained the same since the prior hearing and had not changed.'"  (*Id.*) (citation omitted).  Therefore, Toennies asserts the ALJ's analysis of Dr. Dvorkin-Wininger's opinion is in error and unsupported by the evidentiary record.  (*Id.*)

The Commissioner responds the ALJ adopted Dr. Dvorkin-Wininger's lifting limitations and provided even greater restrictions on Toennies's ability to sit, stand, and walk than Dr. Dvorkin-Wininger.  (Doc. No. 16 at 9-10.)  The Commissioner argues the RFC "only broke from Dr. Dvorkin-WIninger in three meaningful ways: (1) the ALJ did not provide a sit-stand option, (2) the ALJ did not allow additional unscheduled breaks, and (3) the ALJ made no provision for absenteeism."  (*Id.* at 10) (citation omitted).

The Commissioner contends the ALJ provided valid reasons for not adopting those limitations, and, when read as a whole, the ALJ's decision "gives a clear indication of the supportability and consistency of Dr. Dvorkin-Wininger's opinion." (*Id.* at 11.)  The Commissioner maintains Toennies testified her physical conditions had stayed the same, but regardless the ALJ crafted a more restrictive RFC than the state agency physicians and even portions of Dr. Dvorkin-Wininger's opinion. (*Id.* at 12.)  And as the ALJ gave other "valid reasons for discounting Dr. Dvorkin-Wininger's opinion, any error was harmless." (*Id.*)

The ALJ's decision contains the following discussion of the record medical evidence relating to Toennies's physical limitations:

> The objective medical evidence of record is inconsistent with the claimant's subjective allegations of pain and limitation. The claimant has a history of physical impairments; however, examinations and diagnostic tests of record have remained largely unremarkable. For example, prior records dated May 2017 note the claimant demonstrated normal gait and musculoskeletal findings, including normal strength and muscle tone (B1F/28). Views of the claimant's shoulder obtained at that time showed rotator cuff tendinopathy, but no evidence of acute fracture or dislocation (B3F/2). On examination in July 2017, the claimant complained of shoulder girdle pain, but maintained 5/5 motor functioning in the bilateral upper and lower extremities (*Id.* at 4, B5F). She maintained intact sensation to light touch in the bilateral upper extremities excluding the left 5th digit (*Id.*). She was hyperreflexic in the biceps, brd, triceps, and lower extremities symmetrically (*Id.*). She displayed positive Hoffmans bilaterally, but negative babinski and clonus (*Id.*). She exhibited tenderness to cervical palpation, upper trap, and greater tuberosity and the left shoulder was with scapular substitution, positive Hawkins, Neers, and empty can (*Id.*). Views of the cervical spine obtained at that time showed mild to moderate degenerative changes from C4-6, slight retrolisthesis of C2 over C3 and C3 over C4 secondary to spondylosis, with no evidence of compression or malalignment (*Id.* at 8). She was continued on ibuprofen, Tylenol, and physical therapy (*Id.* at 5).
>
> Further, subsequent views of the cervical spine obtained in September 2017 showed only mild degenerative changes with no significant changes from the prior study (*Id.* at 92). She complained of continued pain; however, examination findings in December 2017 were essentially unchanged (*Id.* at 96, B4F, B5F; *see also* B4F/37 for similar findings in February 2018).

In May 2018, the claimant presented with complaints of back pain, fatigue, and lower extremity swelling (B9F/5). Despite her complaints, she appeared in no distress on examination and exhibited no edema (*Id.*at 6). Neurological functioning remained intact and no musculoskeletal abnormalities were documented (*Id.*). The remainder of the examination, including cardiovascular functioning, was negative as well (*Id.*). The next month, the claimant reported neck pain, shoulder pain, and left arm numbness (B11F/6, B12F). Prior EMG findings were reviewed, which showed a cervical radicular process with no evidence of left median neuropathy (*Id.*). On examination, the claimant again appeared in no acute distress and was described as alert and appropriate (*Id.* at 11). She maintained 5/5 strength in the right upper extremity with giveway weakness noted in the left upper extremity (*Id.*). Her dermatomes were numb to light touch in the left upper extremity as compared to the right (*Id.*). She was hyperreflexic in the biceps, brd, triceps, and lower extremities symmetrically with positive Hoffmans sign bilaterally and negative Babinski and clonus (*Id.* at 12). Her gait was narrow based, but otherwise negative (*Id.*). She displayed 1+ pitting edema (*Id.*). She was continued with conservative treatment (*Id.*, 13; *see also* B13F/945 for similar findings in July 2018).

The claimant returned in September 2018 with continued complaints of left arm numbness; yet, it was observed there was no etiology and all workup had been negative (B20F/6, B22F). The claimant also reported using a walker "sometimes" (*Id.*). Examination findings were largely unchanged (*Id.*at 11; *see also* B23F/19, *for example*, for similar findings in January 2019). It was opined the claimant had only mild to moderate functional limitations with regard to her musculoskeletal complaints (*Id.*). In March 2019, it was observed the claimant likely had lateral epicondylitis in the left arm/elbow; however, while she displayed tenderness to palpation in the left elbow, she maintained 5/5 strength and full range of motion (B27F/19).

Furthermore, the claimant has not required surgical intervention, nor has she pursued consistent physical therapy, required the use of a TENs unit, epidural steroid injections, or any other treatment modality commonly seen with disabling impairments. She has reported using a rollator walker, but indicated she used it only intermittently (B23F/7, 11, *for example*). In January 2019, for example, it was noted the claimant could ambulate without assistive devices and complete activities of daily living independently (*Id.*at 8, B22F). Therefore, given the signs and findings on examinations, diagnostic tests, and conservative treatment, the undersigned finds the claimant remains capable of performing a reduced range of light work, as detailed in the above RFC assessment. The postural and manipulative limitations provided adequately address the claimant's continued complaints of pain and limitation.

28

(*Id.* at 18-19.)

The ALJ evaluated the medical opinions of the state agency physicians, as well as Dr. Dvorkin-Wininger, as follows:

> The undersigned finds the State agency physical assessments dated July 13, 2008 and October 18, 2018, which adopted the prior findings to be persuasive (B3A, B5A); however, the undersigned has reduced the lifting and carrying to 15 pounds occasionally and 5-10 pounds frequently and added occasional push/pull with the left upper extremity to account for the claimant's left elbow lateral epicondylitis.
>
> * * *
>
> The undersigned finds the opinion of Yevegenita Dvorkin Wininger dated September 17, 2018 to be somewhat persuasive (B21F; *see also* B20F). Dr. Wininger opined the claimant could occasionally lift 15 pounds and frequently lift 5 to 10 pounds, noting the claimant had difficulty with 15 pounds during her examination, but was able to lift it. Dr. Wininger found no standing/walking impairment and no sitting impairment, but opined the claimant could frequently climb, balance, stoop, crouch, and kneel, rarely crawl, occasionally reach, push/pull, and perform fine and gross manipulation. Dr. Wininger did not provide environmental restrictions and did not find she would need to alternate positions. Dr. Wininger opined moderate pain interferes with the claimant's concentration, would take her off task, and cause absenteeism. He did not find the claimant would need to elevate her legs. He opined she would need extra breaks two times per day. The undersigned has reduced the claimant's lifting and carrying abilities to 15 pounds occasionally and 5 to 10 pounds frequently and added a restriction for occasional push/pull with the left upper extremity. The undersigned finds the physical examinations, diagnostic tests, and treatment history do not support more physical limitations than those provided in the above RFC and notes the claimant herself testified that her physical condition remained the same since the prior hearing and had not changed.

(*Id.* at 21-22.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2). While the ALJ did not use the term "consistency" in her evaluation of Dr. Dvorkin-Wininger's opinion, it is clear the ALJ found some of Dr. Dvorkin-Wininger's limitations unsupported by, and inconsistent with, the objective medical

29

evidence.  The Court agrees with the Commissioner that in reading the opinion as a whole, the ALJ identified examination findings, imaging results, and Toennies's own statements that undercut some of the limitations opined by Dr. Dvorkin-Wininger.  *See Malone v. Comm'r of Soc. Sec.*, No. 1:10CV837, 2011 WL 5520292, at *2 (N.D. Ohio Nov. 10, 2011) ("However, the Government is correct that [the] Sixth Circuit has repeatedly emphasized the need to review the ALJ's decision as a whole.") (citing *Kornecky v. Comm'r*, 167 F. App'x 496, 508 (6th Cir. 2006)).

As for Toennies's contention that the ALJ misstated her testimony, the hearing transcript shows the following exchange between her and the ALJ:

> Q         . . . Would you say since that time, September, 2017, that your physical and or – well, let's start with physical.  That your physical problems have stayed the same, gotten worse, or gotten better?
>
> A    I'd say they've gotten – they've stayed the same.
>
> Q    How so?
>
> A    They – I haven't changed any what – as far the lifting or the walking or the – the lifting, the walking or the – I'm sorry, I lost my train of thought.

(Tr. 61.)  It is true that later, in response to a question from her attorney, Toennies testified her physical condition had changed since 2017, as she now had tennis elbow and leg swelling.  (*Id.* at 63.)  But the ALJ found Toennies's left elbow lateral epicondylitis a severe impairment and reduced the lifting and carrying limitations opined by the state agency reviewing physicians to account for this impairment.  (*Id.* at 14, 21.) The ALJ also discussed examination findings of both no edema and edema in her RFC analysis.  (*Id.* at 18-19.)

It is the ALJ's job to weight the evidence and resolve conflicts, and she did so here.  While Toennies would weigh the evidence differently, it is not for the Court to do so on appeal.  Toennies points to no contrary lines of evidence the ALJ ignored or overlooked.  (Doc. No. 14 at 12-15.)  Nor does she challenge the weight assigned to the state agency reviewing physicians' opinions.  (*Id.*)  "This Court has

followed the Sixth Circuit and reviewed the ALJ's decision as a whole." *Malone*, 2011 WL 5520292, at

\*2. A perfect opinion is not required. *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No

principle of administrative law or common sense requires us to remand a case in quest of

a perfect opinion unless there is reason to believe that the remand might lead to a different result.")

(citations omitted); *see also NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22

L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to

"convert judicial review of agency action into a ping-pong game.").

There is no error in the ALJ's assessment of Dr. Dvorkin-Wininger's opinions.

### 2. CNP Kershaw's Opinion

Toennies argues the ALJ's determination that CNP Kershaw's September 2018 opinion was

unpersuasive was error, as CNPs are acceptable medical sources under the new regulations, the ALJ

incorrectly stated the length of the treatment relationship, and her citation of one patient note showing

improvement and stating CNP Kershaw completed a "check the box" form "is nothing but a perfunctory

assessment that does not take into account the typical waxing and waning of symptoms." (Doc. No. 14 at

16-17.)

The Commissioner responds that Toennies's arguments "do not show the ALJ's decision [] lack[s]

substantial evidence." (Doc. No. 16 at 12.) The ALJ gave valid reasons for the weight assigned to CNP

Kershaw's opinion, and therefore, substantial evidence supports the ALJ's decision. (*Id.* at 13.)

The ALJ's decision contains the following discussion of the record medical evidence relating to

Toennies's mental limitations:

> As for the claimant's mental impairments, the record supports a finding of
> no more than moderate mental limitation. Prior records dated April 2017
> note the claimant presented to the hospital with complaints of suicidal
> ideation, depression, and hallucinations (B1F/4, B2F). Of note, she
> reported she was recently started on Wellbutrin, but indicated she stopped
> taking the medication because "she didn't like the way the medications

31

[were] making her feel" (*Id.*at 5). She was admitted for MDD and was noted to have a history of PTSD and borderline personality, but after only a couple of days, the claimant acknowledged she felt better (*Id.* at 19). In fact, she admitted the hallucinations she was experiencing prior to admission were relieved with medications (*Id.*). She also reported improvement in her anxiety and mood and "overall feels improved" (*Id.*; *see also Id.* at 21 for similar reports). Similarly, the next month, the claimant appeared alert and oriented on examination with pleasant mood and denied any auditory or visual hallucinations (*Id.*at 26). She again verbalized mood and symptom improvement since being admitted and was ultimately discharged (*Id.*, 27). On mental status examination, the claimant exhibited appropriate and engaged behavior and intact orientation (*Id.*at 28). Her speech/language was within normal limits and her mood/affect was appropriate, euthymic, and hopeful (*Id.*). Her thought form and content were coherent and her insight and judgment were fair (*Id.*). Her memory/cognition was intact and her psychomotor activity was normal (*Id.*).

The claimant underwent continued treatment for MDD, PTSD, and personality disorder (B6F, B16F, B24F, *for example*). Subsequent psychiatric examination findings dated May 2018 note the claimant exhibited normal mood and affect (B8F/11). She complained of lack of concentration and memory loss (*Id.*at 13); yet, additional examination findings showed the claimant's posture, behavior, mood, and affect were all within normal limits (*Id.* at 16). Her orientation, judgment, insight, and memory were also within normal limits, as were her attention, concentration, and thought content (*Id.*). Her insight and judgment were fair (*Id.*). Of note, following her examination, the examiner observed, "While I agree that Pam has emotional and cognitive disabilities, I believe that Pam exaggerates her symptoms at times" (*Id.*). Additional records also note MRI findings of the claimant's brain were negative, despite her complaints of memory loss (B11F/9, B13F/948, *for example*).

By January 2019, the claimant admitted her overall health was "good" (B24F/3). She reported taking psychiatric medications without issue (*Id.*). She relayed her history of MDD and suicidal ideation, but reported, "now I'm fine, nothing is worth dying for," indicative of improvement in her mental functioning (*Id.* at 7). Similarly, the following month, the claimant acknowledged she was "doing good" (B25F/7). She reported trying to find independent housing and taking medications as prescribed (*Id.*). She described her mood as "good" aside from when around her son and ex (*Id.*). She noted her sleep, appetite, and energy were unremarkable (*Id.*). The claimant also reported spending time with her sister and enjoying playing games on her phone/iPad (*Id.*). She denied hallucinations, delusions, and paranoia (*Id.*). It was noted, "Overall, client states she is doing good" (*Id.*). Mental status examination found the claimant well groomed, well nourished, dressed appropriately, with good eye contact,

and in no acute distress (*Id.* at 11). Her behavior was cooperative and calm (*Id.*). She remained properly oriented with normal speech and logical, organized, and concrete thought process with no evidence of paranoia or delusions (*Id.*). There was no evidence of suicidal/homicidal ideations (*Id.*). Her mood was euthymic (*Id.*). Her attention and concentration were sustained and her recent and remote memory were within normal limits, while her insight and judgment were fair (*Id.*). The claimant was ultimately found to be "relatively stable" (*Id.*). She "reports fluctuating anxiety symptoms due to interpersonal relationship issues with her son/ex and is trying to seek independent living, otherwise she feels symptoms of mood/anxiety have been relatively stable" (*Id.*).

Moreover, in March 2019, the claimant reported, "everything is working out good" (B27F/3). She reported continued sobriety with good moods and again acknowledged improvement in mental functioning with medications (*Id.*). Mental status examination was unchanged (*Id.*at 6). Indeed, the claimant has not required recent psychiatric hospitalization, and instead has reported improvement in her mental functioning with conservative (medication) treatment. Thus, considering the signs and findings on examination and the claimant's own reports of functioning, the undersigned finds no more than moderate mental limitation, as reflected in the above RFC assessment.

(Tr. 19-20.)

The ALJ evaluated the medical opinions of the state agency reviewing sources, as well as CNP Kershaw, as follows:

The undersigned finds the State agency mental assessments dated July 13, 2008 and October 17, 2018, which adopted the prior findings that the claimant was limited to simple routine tasks (unskilled work) and had the moderate mental limitations provided above (B3A, B5A) to be persuasive, as such findings appear based on and consistent with the medical evidence of record, including the claimant's own reports of functioning.

The undersigned finds the opinion of Lindsey Kershaw, CNP, dated September 11, 2018 to be unpersuasive (B19F). She opined the claimant had marked limitations in understanding and learning terms/instructions or procedures and sequencing multi-step activities. She diagnosed MDD recurrent episode with psychosis, PTSD, and reported history of borderline personality disorder, which she opined caused impairment with the claimant's ability to get along with others. She added the claimant had a 7th grade education with an undiagnosed learning disability. Ms. Kershaw completed a check-the-box type of form and failed to provide a specific function- by-function analysis of the claimant's mental abilities. She also appears to have provided care for the claimant only from June

33

> 2017 to September 2018. Her assessment appears somewhat extreme in light of the medical evidence as a whole, including subsequent treatment records and the claimant's own reports of improvement in functioning with medications (B27F/3, *for example*).

(*Id.* at 21.)

Again, supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2). While the ALJ incorrectly stated the length of the treating relationship, it is clear from the ALJ's opinion as a whole that the ALJ found CNP Kershaw's opinion to be inconsistent with, and unsupported by, the medical evidence in the record.

Again, it is the ALJ's job to weight the evidence and resolve conflicts, and she did so here. While Toennies would weigh the evidence differently, it is not for the Court to do so on appeal. Toennies points to no contrary lines of evidence the ALJ ignored or overlooked, nor does she challenge the weight assigned to the state agency reviewing sources' opinions. (Doc. No. 14 at 16-17.) A perfect opinion is not required. *Fisher*, 869 F.2d at 1057; *NLRB v. Wyman–Gordon Co.*, 394 U.S. at 766 n.6.

There is no error in the ALJ's assessment of CNP Kerhsaw's opinion.

## B.  Toennies's Use of a Walker

Toennies argues the ALJ erred in assessing her need for a walker, as the ALJ acknowledged Toennies's testimony regarding her use of a walker and found Toennies's "medically determinable impairments could reasonably be expected to cause her symptoms," yet the ALJ did not include a restriction for a walker in the RFC. (Doc. No. 14 at 17.) Toennies asserts, "The anomalies in the Doctor's notes, both pro and con regarding use of an ambulatory device, required far more analysis than that afforded by the ALJ." (*Id.* at 18.)

34

The Commissioner argues Toennies's arguments fail for two reasons: (1) she uses the wrong standard of review; and (2) "the ALJ provided ample reasons for not finding that plaintiff required a walker." (Doc. No. 16 at 14-15.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

35

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. Appx. 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The Court agrees with the Commissioner that Toennies's arguments regarding her use of a walker ask the Court to reweigh the evidence, which it cannot do. As Toennies acknowledges (Doc. No. 14 at 18), the ALJ relied on other evidence in the record regarding Toennies's use of a walker in formulating the RFC. (Tr. 19, 22.) Toennies does not argue the ALJ cherry-picked the record or failed to build an accurate and logical bridge from the evidence to her conclusions. (Doc. No. 14 at 17-18.) Rather, after

36

acknowledging the evidence is mixed, Toennies insists the ALJ should have gone into more detail in her analysis.  But there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner*, 658 F. App'x at 254.  The ALJ acknowledged record evidence regarding Toennies's use of a walker, including that she used it "sometimes," reports that Toennies could walk without an assistive device, and reports that Toennies could perform activities of daily living independently.  (Tr. 19, 22.)  *See Forrester v. Comm'r of Soc. Sec.*, No. 2:16-cv-1156, 2017 WL 4769006, at *3 (S.D. Ohio Oct. 23, 2017) ("Unlike many cases involving the use of a cane, the ALJ did not overlook evidence concerning Plaintiff's need for the cane or fail to address this issue.") (collecting cases).  "[W]here there is conflicting evidence concerning the need for a cane, 'it is the ALJ's task, and not the Court's, to resolve conflicts in the evidence.'"  *Forrester*, 2017 WL 4769006, at *4 (citation omitted).  The same is true here.  Furthermore, the ALJ's reasoning regarding Toennies's need for a walker is clear from her decision.

Substantial evidence supports the ALJ's RFC finding that Toennies did not require a walker.

## C. The VE's Testimony

Toennies argues the ALJ erred at Step Five in relying on the VE's testimony, which was "factually incorrect," "uninformed," and "incomplete."  (Doc. No. 14 at 19-20.)  First, Toennies asserts the DOT does not contain the occupation of "tanning salon attendant."  (*Id.* at 20.)  Second, Toennies maintains the DOT occupation of parking lot attendant "requires a person to '[park] automobiles for customers in [a] parking lot or storage garage'"; as Toennies does not drive and has never driven, Toennies asserts she could not perform this job either.  (*Id.*)

The Commissioner responds first that Toennies's assertion that the DOT does not contain the position of "tanning salon attendant" is incorrect.  (Doc. No. 16 at 16.)  Second, the Commissioner maintains that to the extent there was "any ambiguity" in the description of "parking lot attendant" in the

DOT, Toennies's attorney – the same on appeal here – could have questioned the VE but chose not to do so.  (*Id.*)  The Commissioner asserts the ALJ was correct to rely on the VE's testimony.  (*Id.*)

At Step Five of the sequential disability evaluation, the Commissioner bears the burden in proving work exists in the national economy that a claimant can perform.  "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."  20 C.F.R. § 416.966(b).  ALJs "will take administrative notice of 'reliable job information' available from various publications, including the DOT."  SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).  In addition, as set forth in 20 C.F.R. § 416.966(e), ALJs may use VEs "as sources of occupational evidence in certain cases."  (*Id.*)  "When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled."  (*Id.*)  At the hearing level, the ALJ must inquire on the record "as to whether or not there is such inconsistency."  (*Id.*)  Further, no one source "automatically 'trumps' when there is a conflict."  (*Id.*)  Rather, the ALJ "must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information."  (*Id.*)

Different courts have reached different conclusions under varying circumstances as to whether "tanning salon attendant" is an occupation in the DOT.  *See, e.g., James S. v. Comm'r, Soc. Sec. Admin.*, No. 3:18-cv-00394-JO, 2019 WL 4345662, at *5 (D. Ore. Sept. 11, 2019) (collecting cases) ("The ALJ erred when he failed to seek a clarification from the [VE] about the tanning salon attendant occupation."); *Townsend v. Comm'r of Soc. Sec.*, No. 1:17-cv-2218, 2018 WL 5808745, at *6-8 (N.D. Ohio Nov. 6, 2018) (Commissioner conceded the job was not listed in the DOT); *Sievers v. Berryhill*, 734 F. App'x 467, 471 (9th Cir. 2018) ("The ALJ misidentified [DOT] listing 359.567-014 as the listing for tanning salon

38

attendant, when this listing actually refers to the semi-skilled job weight-reduction specialist, which Sievers does not have the skills to perform."); *Grady v. Colvin*, No. 4:14-cv-01893-JAR, 2016 WL 695603, at *7 (E.D. Mo. Feb. 22, 2016) ("The DOT was last updated in 1991 and the United States Department of Labor's 'O*Net Online' service . . . is the current source of information used to determine qualifying work experience.  Consistent with the VE's testimony, the job of tanning salon attendant has been assigned DOT code 359.567-014 . . . Accordingly, the VE's testimony did not conflict with the DOT."); *James v. Colvin*, No. H-14-1650, 2015 WL 6394423, at *25 (S.D. Tx. Sept. 30, 2015) ("Plaintiff also contends that the tanning salon attendant is not in the DOT at all.  These are non-issues because the VE is an expert on work skills and occupations and is not limited to jobs described in the DOT.") (citation omitted).

Here, unlike *Townsend*, the Commissioner does not concede the tanning salon attendant position is not listed in the DOT; rather, he insists it does appear in the DOT.  (Doc. No. 16 at 16.)  While the Court could not find "tanning salon attendant" in the DOT, like the *Grady* court, the Court found this position with DOT code 359.567-014 in the Department of Labor's "O*Net Online."  Department of Labor, https://www.onetonline.org/crosswalk/DOT?s=359.567-014&g=Go (last visited May 20, 2020).  *See also* https://occupationalinfo.org/onet/69999b.html (last visited May 20, 2020).  The regulations state ALJs may take judicial notice of governmental and other publications, including but not limited to the DOT.  20 C.F.R. § 416.966(d).  Furthermore, VE testimony is occupational evidence that is not "trumped" by the DOT when there is a conflict.  SSR 00-4p, 2000 WL 1898704, at *2.  The ALJ asked the VE on the record whether her testimony conflicted with the DOT.  (Tr. 74-75.)  Having earlier stated she disagreed with the DOT's parking lot attendant description of frequent reaching, handling, and fingering, the VE testified as follows: "I had already given you where I had differed, on the parking lot attendant.  The DOT does not distinguish between a frequent and an occasional with hands, just in their analysis of jobs.  From personal

practice, I tend to give more preference when it is the dominant hand that cannot be used at the frequency level that the DOT says." (*Id.* at 75.)  Toennies does not argue the ALJ failed to comply with SSR 00-4p. Under the totality of the circumstances here, the Court finds it was not error for the ALJ to rely on the VE's testimony regarding the tanning salon attendant position.

Furthermore, even if the VE erred in identifying a "non-existent job," the error was harmless as the VE identified another job Toennies could perform. *Arnold v. Colvin*, No. 3:14-cv-00442, 2014 WL 5822875, at *10 (M.D. Tenn. Nov. 10, 2014).  Toennies challenges the ALJ's reliance on the VE's testimony regarding the parking lot attendant job because it "requires" a person to park automobiles for customers, and Toennies has never driven.  (Doc. No. 14 at 20.)  But the VE testified as follows regarding the parking lot attendant position: "While the DOT says frequent reach, handle, finger, the  lots that I've seen, *basically the person is giving out tickets and then there's long periods of sitting*. So I don't – I guess I don't agree with the frequent reach, handle, finger in that particular job."  (Tr. 72) (emphasis added).  While the DOT description includes the statement "Parks automobiles for customers in parking lot or storage garage," it also says, "Records time and drives automobile to parking space*, or points out parking space for customer's use*."  Dictionary of Occupational Titles, https://occupationalinfo.org/91/915473010.html (last visited May 20, 2020) (emphasis added).  Again, VE testimony is occupational evidence, and Toennies does not argue the ALJ failed to comply with SSR 00-4p.  Nor does Toennies otherwise argue that the number of parking lot attendant jobs fails to constitute a significant number of jobs in the national economy.

The Court agrees with the Commissioner that Toennies's Step Five argument is an attempt to place her own knowledge of the DOT over that of the VE.  Substantial evidence supports the ALJ's Step Five findings.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date:  June 1, 2020                                    *s/ Jonathan Greenberg*
                                                       Jonathan D. Greenberg
                                                       United States Magistrate Judge